IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIAN SCOTT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DST SYSTEMS, INC., STEPHEN C. HOOLEY, GARY D. FORSEE, CHARLES EDGAR HALDEMAN, SAMUEL G. LISS, JEROME H. BAILEY, JOSEPH C. ANTONELLIS, LOWELL L. BRYAN, and LYNN DORSEY BLEIL,<br><br>Defendants. | Civil Action No. 1:18-cv-00286-RGA |
| JAMES D. WILLIAMS,<br><br>Plaintiff,<br><br>vs.<br><br>DST SYSTEMS, INC., STEPHEN C. HOOLEY, CHARLES E. HALDEMAN, SAMUEL G. LISS, LOWELL L. BRYAN, LYNN D. BLIEL, JEROME H. BAILEY, JOSEPH C. ANTONELLIS, and GARY D. FORSEE,<br><br>Defendants. | Civil Action No. 1:18-cv-00322-RGA |

**MEMORANDUM OPINION**

August 23, 2019



**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before me are Plaintiff Brian Scott's Motion for Attorney Fees[1] (C.A. 18-286, D.I. 19) and Plaintiff James Williams's Motion for Attorney Fees (C.A. 18-322, D.I. 7). The Parties have briefed the motions (C.A. 18-286, D.I. 20, 25, 28; C.A. 18-322, D.I 8, 16, 19) and submitted supplemental briefing at my request (C.A. 18-286, D.I. 32, 33; C.A. 18-322, D.I. 23, 26). Scott seeks $115,000. (C.A. 18-286, D.I. 20 at 1). Williams seeks $100,000. (C.A. 18-322, D.I. 8 at 24). For the reasons discussed more fully below, I will deny Plaintiffs' motions.

## I.    BACKGROUND

These cases stem from the March 28, 2018 merger of DST Systems, Inc. ("DST") with SS&C Technologies, Inc. ("SS&C"). (D.I. 20 at 1-3).[2] The DST Board initiated the transaction on January 11, 2018 when it entered into an agreement and plan of merger with SS&C. (*Id.* at 1). SS&C was to acquire DST for $84.00 per share of common stock. (*Id.*). The merger was valued at $5.4 billion. (D.I. 1 at ¶ 25). Defendants issued a preliminary proxy statement describing the details of the transaction on February 7, 2018. (D.I. 25 at 1). Three lawsuits, two in this court and another in Missouri, were filed within weeks.[3] (*Id.*). The lawsuits alleged that the preliminary proxy statement omitted material information in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. (*Id.*; *see also* D.I. 1). DST filed its definitive proxy statement ("Proxy") with the SEC on February 27, 2018. (D.I. 25 at 5). Two weeks later

---

[1] Dennis Pratt, Plaintiff to a Missouri lawsuit filed against Defendants, originally joined Mr. Scott's fee application. (C.A. 18-286, D.I. 20 at 1 n.1). His request has since been withdrawn. (C.A. 18-286, D.I. 33 at 4).

[2] Unless otherwise noted, citations to the docket are to C.A. 18-286.

[3] The Scott case was filed on February 20, 2018. Based on billing records, Scott's attorneys spent eleven hours of attorney time on the case on or before February 20th. (D.I. 22-2 at 2 & Exh. B). The Williams case was filed on February 27, 2018. Based on billing records, Williams' attorneys spent 14.75 hours of attorney time (two partner hours and 12.75 associate hours) on the case on or before February 27th. (C.A. 18-322, D.I. 9, Exhs. 1, 10, 11).

DST voluntarily issued a supplemental disclosure ("Supplement") to moot the pending lawsuits. (*Id.*). The Plaintiffs agreed that the supplemental disclosures mooted their lawsuits and began pursuit of attorneys' fees. (*Id.* at 6). These motions followed.

## II. LEGAL STANDARD

### A. Claims Under Section 14(a)

Section 14(a) of the Securities Exchange Act of 1934 renders it unlawful to seek proxies in violation of "such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). Rule 14-a9, promulgated by the SEC pursuant to Section 14(a), provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9. There is a private cause of action under Section 14(a). *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). In the Third Circuit, to prevail in such an action a plaintiff must prove:

> (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.

*Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (quotation marks omitted).

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the

3

deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (emphasis in original).

A "determination of materiality concerns a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts." *Gen. Elec. Co.*, 980 F.2d at 932 (internal quotation marks omitted). "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). Thus, whether information is material in "any particular case . . . depends on the facts." *Id.* at 239. "Only if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law. . . ." *TSC Indus., Inc.*, 426 U.S. at 450 (quotation marks omitted).

### B. Attorneys' Fees

"[T]he traditional American rule disfavors the award of attorney's fees in the absence of statutory or contractual authorization." *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 145 (3d Cir. 1998). A court may, however, exercise its equitable powers to award attorneys' fees to a litigant who "successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970). "This well recognized exception, known as the 'common benefit' or 'common fund' equitable doctrine, is premised upon the rationale that it would be unfair to require one party to bear the entire expense which results in the benefit to a large class of persons." *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921, 923 (E.D. Pa. 1993). This doctrine applies when three elements are satisfied: "(1) the plaintiff must confer a substantial benefit; (2) to members of an ascertainable

4

class; and (3) the court must ensure that the costs are proportionally spread among that class."

*Polonski*, 137 F.3d at 145. Moreover, when a suit is mooted prior to final judgment, it is

necessary to determine that the suit was meritorious when filed and caused the benefit. *Kahan v.*

*Rosenstiel*, 424 F.2d 161, 167 (3d Cir. 1970). A suit is "meritorious" if it could have survived a

motion to dismiss. *Id.*

The plaintiff bears the burden of demonstrating merit and substantial benefit.

*Cooperstock*, 820 F. Supp. at 923. If the plaintiff is successful, the burden shifts to the defendant

"to prove that the lawsuit did not in any way cause their action which ultimately rendered the suit

moot." *Id.*; *see also Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1984).

"[T]he award of attorney's fees is not limited to circumstances in which there is a

monetary fund from which fees may be paid, but extends to any situation in which the litigation

has conferred a substantial benefit on the members of an ascertainable class." *Kahan*, 424 F.2d

at 166 (quotation marks omitted).

## III. ANALYSIS

I do not decide the first issue that Plaintiffs have to show, that is, that the lawsuit could

have survived a motion to dismiss. I do note, however, notwithstanding the complaints'

boilerplate allegations of falsity and misrepresentations, the complaints only allege facts related

to purported material omissions.

I turn to the issue of "substantial benefit." Plaintiffs' argument for receiving attorneys'

fees under the common benefit doctrine is, essentially, that they caused[4] Defendants to disclose

previously withheld material information, thus providing DST stockholders with a substantial

benefit. (*See* D.I. 20 at 4-12; C.A. 18-322, D.I. 8 at 8-18). Accordingly, in order to establish a

---

[4] Causation is not at issue in these motions as the Supplement expressly states its purpose was to
moot these lawsuits. (D.I. 22-1 at 3).

substantial benefit, Plaintiffs must establish, as a factual predicate, that the supplemental

information was material. *Cf. In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 725 (7th Cir.

2016) (discussing, in the context of a class action disclosure case, that a benefit to class members

from a disclosure may be established if an omission is material (citing *In re Trulia, Inc.*

*Stockholder Litig.*, 129 A.3d 884, 898-99 (Del. Ch. 2016))). Defendants' supplemental

disclosures fall into three categories: (1) projections of unlevered free cash flow; (2) Bank of

America Merrill Lynch's discounted cash flow analysis; and (3) multiples used for Bank of

America Merrill Lynch's comparable companies and selected precedent transaction analyses. A

review of the record as to each of the disclosures reveals that Plaintiffs have failed to carry their

burden on the materiality of the information. Thus, Plaintiffs have not established that they

provided the stockholders with a substantial benefit so as to warrant an award of attorneys' fees.

I address each category of disclosure in turn.

### A. Unlevered Free Cash Flow Projections

Defendants supplemented the "Financial Forecasts" portion of the Proxy. As originally

filed, the Proxy did not mention Bank of America Merrill Lynch's reliance on unlevered free

cash flow,[5] a non-GAAP[6] financial measure, in forming its fairness opinion. (*See* D.I. 26, Exh. 1

at 52-54). The Supplement included the following additional disclosure:[7]

---

[5] "Unlevered free cash flow shows how much cash is available to the firm before taking financial
obligations into account." *Unlevered Free Cash Flow–UFCF*, INVESTOPEDIA,
https://www.investopedia.com/terms/u/unlevered-free-cash-flow-ufcf.asp (last visited July 29,
2019). The formula for calculating unlevered fee cash flow is
UFCF=EBITDA−CAPEX−Working Capital−Taxes. *Id.* ("EBITDA" stands for "earnings before
interest, taxes, depreciation and amortization" and "CAPEX" refers to capital expenditures).
[6] "Non-GAAP earnings are an alternative accounting method used to measure the earnings of a
company, and many companies report non-GAAP earnings in addition to their earnings based on
Generally Accepted Accounting Principles (GAAP)." *Non-GAAP Earnings*, INVESTOPEDIA,
https://www.investopedia.com/terms/n/non-gaap-earnings.asp (last visited Aug. 1, 2019).
[7] Supplemental disclosures are indicated by underlining or strikethroughs.

**Financial Forecast**

*The disclosure in the section captioned "Proposal 1: Adoption of the Merger Agreement—The Merger—Financial Forecast" is supplemented by providing the following additional disclosure at the end of the tenth paragraph thereof on page 53 of the Definitive Proxy Statement.*

The non-GAAP financial measures used in the Forecast were relied upon by BofA Merrill Lynch for purposes of its fairness opinion and by the Board of Directors in connection with its consideration of the merger. Financial measures provided to a financial advisor are excluded from the definition of non-GAAP financial measures and therefore, are not subject to SEC rules regarding disclosures of non-GAAP financial measures, which would otherwise require a reconciliation of a non-GAAP financial measure to a GAAP financial measure. Reconciliations of non-GAAP financial measures were not relied upon by BofA Merrill Lynch for purposes of its fairness opinion or by the Board of Directors in connection with its consideration of the merger. Accordingly, we have not provided a reconciliation of the financial measures included in the Forecast.

*The disclosure in the section captioned "Proposal 1: Adoption of the Merger Agreement—The Merger — Financial Forecast" is supplemented by providing the following additional disclosure after the table and footnotes which overlaps pages 53-54 of the Definitive Proxy Statement.*

The following table presents a summary of the unlevered, after-tax free cash flows for the fiscal years ending December 31, 2018 through 2020 and the terminal year used in the discounted cash flow analysis for the Company on a stand-alone basis.

| | Fiscal Year Ending December 31, | | | Terminal Year |
|---|---|---|---|---|
| | 2018E | 2019E | 2020E | |
| Unlevered Free Cash Flow | $221 | $286 | $331 | $328 |

Note: Dollars in millions

The Company's unlevered, after-tax free cash flows were computed by BofA Merrill Lynch from the other projected line items in the Forecast provided by DST in order to facilitate the discounted cash flow analysis by taking tax-effected Adjusted EBIT, then adding depreciation and amortization from the Forecast, subtracting capital expenditures from the Forecast and adjusting for changes in net working capital. This estimated unlevered, after-tax free cash flow information was provided to the Board of Directors but was not provided to SS&C. Tax-effected Adjusted EBIT was computed by taking EBITDA from the Forecast, then subtracting depreciation and amortization from the Forecast, subtracting taxes (using an assumed effective tax rate reflective of TCJA, with the approval of DST management) and burdened for stock-based compensation but not burdened for one-time, non-recurring items.

(D.I. 22-1 at 7-8).

Plaintiffs argue that this information was material and that its disclosure benefitted the

DST stockholders. (D.I. 20 at 5-7; C.A. 18-322, D.I. 8 at 10-13). They cite several cases. (*Id.*).

None of those cases, however, establish the factual predicate necessary to find materiality in *this*

case. *See, e.g., In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *8-10 (C.D. Cal. May 2,

2014) (holding that omitted unlevered free cash flow projections, standing alone, were not

7

material as a matter of law and leaving for the factfinder the question of whether the omission was misleading considering all the facts of the case); *Brown v. Brewer*, 2010 WL 2472182, at *21 (C.D. Cal. June 17, 2010) (denying summary judgment of no material omission where the "total mix" of information provided to stockholders included no projected growth rates); *In re Netsmart Techs., Inc. Shareholders Litig.*, 924 A.2d 171, 201-03 (Del. Ch. 2007) (holding, based on a well-developed factual record, that omitted financial projections were material where the company did not disclose any projections for certain years and disclosed projections that were different than those used by financial advisors). None of the cited cases stand for the proposition that unlevered free cash flow projections are *per se* material. Moreover, caselaw is not evidence of what information is material in this case.

Similarly, attorney argument is not evidence. Plaintiffs argue that, absent the Supplement, DST "stockholders would be misled as to the fair value of their stock." (C.A. 18-322, D.I. 8 at 11). They do not, however, explain *how* the stockholders would have been misled. Nor do they cite evidence or expert opinion on the issue. They merely conclude, without examination of the particular facts of this case, that the additional information "allowed DST's stockholders to assess the financial analyses performed by the Financial Advisor and properly understand whether the consideration represented fair value." (*Id.* at 13). And this, they conclude, was a "substantial benefit." (*Id.*). I do not find this sufficient.

Plaintiffs have failed to carry their burden of establishing that they provided a substantial benefit to DST stockholders by causing the disclosure of unlevered free cash flow projections. It may be true that the disclosure of material information necessarily provides a substantial benefit to stockholders. In order to establish a substantial benefit under that theory, however, Plaintiffs must establish the factual predicate that the disclosed information was material under the facts of

this specific case. They have failed to carry their burden on that point. Absent a showing of materiality, Plaintiffs have no basis to claim they provided DST stockholders with a benefit, substantial or otherwise. Thus, I will not award attorneys' fees based on Defendants' disclosure of unlevered free cash flow projections.

### B. Additional Disclosures Related to Discounted Cash Flow Analysis

Defendants supplemented the Discounted Cash Flow Analysis portion of the Proxy. The Proxy as originally filed provided:

*Discounted Cash Flow Analysis.* BofA Merrill Lynch performed a discounted cash flow analysis of DST to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that DST was forecasted to generate during DST's fiscal years 2018 through 2020 based on the DST management forecasts. BofA Merrill Lynch calculated terminal values for DST by applying terminal multiples of 9.0x to 11.5x, which range was selected based on BofA Merrill Lynch's professional judgment and experience, to DST's fiscal year 2020 estimated EBITDA and perpetuity growth rates of 3.25% to 3.50%, which range was selected based on BofA Merrill Lynch's professional judgment and experience. The cash flows and terminal values in each case were then discounted to present value as of December 31, 2017 using discount rates ranging from 9.00% to 11.25%, which were based on an estimate of DST's weighted average cost of capital, and adjusted to exclude DST's net debt as of December 31, 2017 and to include the value of certain interests in joint ventures and certain non-core assets of DST. This analysis indicated the following approximate implied per share equity value reference ranges for DST as compared to the merger consideration:

| Implied Per Share Equity Value Reference Range for DST | | Merger Consideration |
|---|---|---|
| **Terminal Multiple** | **Perpetuity Growth Rate** | |
| $67.75 – $89.00 | $62.75 – $91.50 | $84.00 |

(D.I. 26, Exh. 1 at 50).

The Supplement replaced that section with this amended language:

*The disclosure in the sub-section captioned "Discounted Cash Flow Analysis" is amended and supplemented by deleting the first paragraph thereof on page 50 in its entirety and replacing it with the following disclosure:*

BofA Merrill Lynch performed a discounted cash flow analysis of DST to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that DST was forecasted to generate during DST's fiscal years 2018 through 2020 based on the DST management forecasts (as described under "Proposal 1: Adoption of the Merger Agreement—The Merger—Financial Forecast"). BofA Merrill Lynch calculated terminal values for DST by applying terminal multiples of 9.0x to 11.5x to DST's fiscal year 2020 estimated EBITDA and perpetuity growth rates of 3.25% to 3.50%, which were selected in each case based on BofA Merrill Lynch's professional judgment and experience and after taking into consideration, among other things, the observed data for DST and the selected publicly traded companies, the historical trading multiples of DST and the selected publicly traded companies, and certain differences in the respective financial profiles of DST and the selected publicly traded companies as described under "Sum of the Parts—Selected Publicly Traded Companies Analysis". The cash flows and terminal values in each case were then discounted to present value as of December 31, 2017 using discount rates ranging from 9.00% to 11.25%, which were based on an estimate of DST's weighted average cost of capital derived using the capital asset pricing model, which took into account the risk-free rate, the levered beta of DST, the appropriate equity market risk premium, the size premium of DST and DST's estimated cost of debt, and adjusted to exclude DST's net debt as of December 31, 2017 and to include the value of certain interests in joint ventures and certain non-core assets of DST. This analysis indicated the following approximate implied per share equity value reference ranges for DST as compared to the merger consideration:

| Implied Per Share Equity Value Reference Range for DST | | Merger Consideration |
|---|---|---|
| Terminal Multiple | Perpetuity Growth Rate | |
| $67.75 – $89.00 | $62.75 – $91.50 | $84.00 |

(D.I. 22-1 at 7 (language added by Supplement highlighted)).

This supplemental disclosure refers back to the unlevered free cash flow projections I discuss above. I will not readdress that issue here.

The disclosure also adds information on the discount rate, terminal multiple, and perpetuity growth rate inputs. Defendants argue that these additional data points did not alter the total mix of information previously available to DST stockholders. (D.I. 25 at 14). Plaintiffs' argument to the contrary is unpersuasive. They cite no authority to support a conclusion that the information disclosed by the Supplement is *per se* material. (D.I. 20 at 7-8; C.A. 18-322, D.I. 8 at 13-16). Rather, they once again cite to cases where courts found, on better developed records, that certain omissions were material given the particular factual circumstances. (*Id.*). They also point to a law review article that discusses how various inputs can impact a banker's final

valuation.  (*Id.* (citing Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576-77 (2006)).  Neither caselaw nor law review articles are evidence of materiality in this case.

Plaintiffs have not carried their burden to show that the additional disclosures related to the discounted cash flow analysis were material.[8]  As factual support for their argument, Plaintiffs merely point to the additional information, point to the fact that the information was not previously disclosed, and conclude that the information was material.  (*Id.*).  This type of conclusory argument, divorced from the facts of this case, is not sufficient to establish that the supplemental discounted cash flow analysis information was material.  As Plaintiffs have failed to establish materiality, they have also failed to establish that they provided a substantial benefit to DST stockholders.  Accordingly, I will not award Plaintiffs attorneys' fees based on this additional disclosure.

### C.  *Additional Disclosures Related to Selected Comparable Companies Analysis and Selected Precedent Transaction Analysis*

Defendants supplemented the Proxy with additional financial data relevant to the comparable companies analysis and selected precedent transaction analysis.  (*See* D.I. 22-1 at 3-7).  Plaintiffs argue that these disclosures were material, but cite no authority for concluding that individual variables, such as those disclosed by Defendants, are *per se* material.  (*See* D.I. 20 at 8-12; C.A. 18-322, D.I. 8 at 16-18).  Plaintiffs also fail to connect the supplemental information to the facts of this case such that I could conclude that the omissions were material to DST stockholders given the total mix of information available to them.  Thus, as with the other supplemental disclosure,  Plaintiffs have failed to establish materiality and have failed to

---

[8] Indeed, the additional disclosures seem to be obviously non-material, consisting of extra verbiage to amplify the statement that BofA Merrill Lynch was using "professional judgment and expertise" to do its analysis.

establish that they provided a substantial benefit to DST stockholders. Accordingly, I will not award Plaintiffs attorneys' fees based on this additional disclosure.

## IV.    CONCLUSION

Plaintiffs' did not develop a factual record or proffer expert opinions in support of their motions. Rather, they rely on the bald fact of Defendants' supplemental disclosures. (*See generally* D.I. 20; C.A. 18-322, D.I. 8). Essentially, they argue throughout their briefing that the missing information was so plainly material that its disclosure was a substantial benefit to the stockholders as a matter of law. (*Id.*). I do not find Plaintiffs' position persuasive. It is far from clear, as a factual matter in this case, that the information disclosed by Defendants was material. Plaintiffs' attorneys' arguments, opinions from judges in other cases, and law review articles do not carry the weight Plaintiffs put on them. Moreover, absent evidence that the information was material, there is no basis in the record to find that Plaintiffs conferred any benefit on DST stockholders. Simply put, Plaintiffs have failed to carry their evidentiary burden. Thus, I will deny Plaintiffs' motions for attorneys' fees.